Plaintiff instituted this suit seeking to recover the maximum amount of compensation allowed under Act No. 20 of 1914, as amended, alleging he is totally and permanently disabled to perform any work of a reasonable character; that his disability was caused by injuries he received in an accident which occurred while he was performing duties within the course and scope of his employment and that the accident arose out of his employment. He impleaded as defendants his employer and his compensation insurer.
The disability of plaintiff is admitted by defendants but they deny that it is the result of any accident or injury received by him and affirmatively allege that his disability is due to and has resulted from systemic conditions. On the trial of the case, it was shown that plaintiff was suffering with pyorrhea, infected tonsils and syphilis, and the lower court found that plaintiff's disability was the result of these systemic conditions and not from the injuries received by him in the accident which occurred while he was in the employ of defendant. Plaintiff is now prosecuting this appeal.
The lower court prefaced its reasons for its refusal to grant a rehearing and award judgment for plaintiff with the following remarks:
"The Court having rejected the demands of plaintiff, he applies for a rehearing on the ground that the Court erred in holding that plaintiff had not sustained the burden of proof. While we confessed that we did not possibly understand the case or the medical testimony as well as counsel for plaintiff, that if we did, we might be able to find a judgment for plaintiff, as there is evidence leading to the conclusion that the condition of the plaintiff's eye is a result of glare blindness, and we are still of the opinion that our lack of knowledge of the subject matter may be the reason that we cannot find from the evidence that it preponderates in favor of plaintiff, and if the Court does feel that it does, either from lack of ability to understand the import of the testimony, it is the Court's duty to so hold, the same that he would do, if there was in reality a lack of evidence or a preponderance in favor of plaintiff. We make this statement so that the Appellate Court will not adhere to the rule of giving `great weight' to the conclusions of the trial Court, but will decide the case on the record, as a large part of the testimony was taken out of Court and I have had to reach my conclusions largely from the record.
"I feel that the record clearly shows that the condition of plaintiff's eye could have resulted from one or two causes, either syphilis or light glare. The preponderance of the medical experts says the cause is syphilis and all of the symptoms or index points are present to prove that it is syphilis; while on the other hand, if the condition is the result of light glare, provided the light was sufficiently strong; if *Page 239 
the light was sufficiently near; that if the exposure was sufficiently long enough. These IFS appear to me to be indefinite or not susceptible of proof, therefore, we had before us a given result, which could obtain from either one of two causes. One cause, syphilis, was definite; the other cause, glare blindness, was indefinite (as I view the evidence in the absence of proof of time, distance and intensity required of the light) and with this set-up, I feel compelled to determine the cause of plaintiff's disability to be that resulting from syphilis. Dr. Wilkinson did not find anything that would indicate syphilis or other infection and in answer to the direct question if `he could have glare injury resulting in blindness' and he answered `he could have'. And on page 69, he said `with the history of the exposure to light, I would be inclined to attribute it to that exposure.'
"Again he was asked if he could say definitely that syphilis did not cause the condition, and he said he saw no evidence of it. On cross-examination he said that if the blindness came on suddenly, he would say that it was caused by the torch; and if it came on gradually it could be syphilis.
"We have said that Dr. Wilkinson's testimony appeared to us to be negative in character, rather than positive, and while other physicians admitted some of the statements made by Dr. Wilkinson and vice versa, we concluded that with the positive character of the testimony of the other physicians, with the known and definite syphilitic condition, as against the negative testimony of Dr. Wilkinson, plus the uncertain factors on which it was based, to-wit, intensity of the heat, proximity and duration, we felt and still feel that the preponderance of the testimony, as I have been able to appreciate it, is in favor of defendant.
"For the reasons assigned, the application for rehearing is overruled."
After a careful study of this case, we fail to find any unusual difference between it and the average compensation case which comes before us, in fact, after analyzing carefully the testimony of the lay witnesses and the medical men, it so clearly preponderates in favor of plaintiff's contention until we have had little or no difficulty in arriving at a decision.
Plaintiff is a white man, fifty years of age and an automobile mechanic by trade. About nine years prior to the alleged accident, which is the cause of this suit, he was struck in the right eye by a small piece of steel which caused the loss of sight of that eye for all practical purposes. That condition was permanent at the time of the accident involved in this case, which occurred on March 11, 1942. For all practical purposes and so far as plaintiff knew, his left eye was sound and his vision therein unaffected. He had worked for his present employer and the former proprietor of the same automobile garage for several years. His work required the use of small and large tools and on small and large parts of automobiles. Some of his work was of a delicate nature and, all in all, in order to properly perform his labor, it was necessary that he have good eyesight. Plaintiff did perform this work to the satisfaction of his immediate superior and employer and at no time was there any complaint about his work, in fact, his fellow workers and his employer did not know that he had only the use of one eye. Plaintiff enjoyed hunting birds and ducks and was recognized by his friends and associates as an extra good shot. Only a few days before the occurrence of the accident, he went quail hunting and killed six birds out of six shots. His employer testified that he was a willing worker, ready at all times to work overtime; that he usually worked nine to ten hours a day, six days a week, and earned $40 or more each week.
On the day of the accident, plaintiff went to work as usual. That afternoon he was underneath a car attempting to remove a loose battery carrier when it fell in his face, the trash, dirt and acid on said carrier falling into his eye. He came out from under the car and used his handkerchief to wipe the foreign matter out of his eye. When plaintiff thought he had gotten everything out and his eye was all right again, he was called by a fellow worker, Nevins Flowers, to assist in removing a ring from a flywheel and to put a new one on. To accomplish this job, it was necessary that the ring be expanded by heating it, which heat was produced by an acetylene blowtorch. Flowers handled the torch and plaintiff used the pliers, chisel and hammer. The heat was applied to the ring by the torch which was gradually moved around it. Plaintiff's part of the job was to work on the ring only a few inches behind the moving blowtorch, using pliers, chisel and hammer to loosen the ring from the wheel. After the ring was removed a new one was heated in the same way while the plaintiff held it with a pair of pliers. *Page 240 
He then hammered it onto the wheel. In this process plaintiff was still working just behind the torch. He worked at this job for approximately thirty minutes and, according to the testimony, the torch was out of order, causing the flame to be much brighter at times than it should have been and the blaze to vary from six inches in length to twelve inches. There is no dispute over the fact that the heat given off by this torch was very great. Plaintiff testified, without contradiction, that it was necessary for the torch to be raised at times to adjust it, and that on these occasions it was often within eight inches of his face and eye, and it is a physical fact that when he was loosening the ring with his chisel and pliers, he could not have been farther from the torch than the length of his arms, even though he had worked with his arms outstretched their full length, which is hardly probable. It, to our mind, was physically impossible for plaintiff to have kept the light and heat out his eye during the time he was working on the ring, since he was not wearing goggles, or any other protection for his eye, and it is not suggested that any were furnished him to be used.
Plaintiff thought he continued on this job until a new ring had been hammered onto the wheel, but his helper who was handling the job, testified that plaintiff was forced to quit during this process because of the trouble with his eye and he had to call another employee to assist in finishing the job. Regardless of that difference in opinion, plaintiff worked at the job the greater part of the time it took to complete it and until he could no longer see what he was doing. We are of the opinion all of the evidence fairly fixes the time plaintiff was working in close proximity to the blowtorch at thirty minutes. When he could no longer see, plaintiff walked away and asked another employee to look at his eye and see what was the matter with it and if there was anything in it. Plaintiff then went to the foreman, reported his trouble and was directed by him to go to a doctor in Oil City, who told him there was a scar or cut place on the eyeball, but that it would be all right. Plaintiff did not work any more that day, which was Wednesday. On Thursday, he went back to his place of employment and sat around all day, but did not work. Plaintiff repeated this the next day but did go to another doctor who advised him to go to Shreveport to an eye specialist, which he did on Saturday, March 14th. This specialist treated him for some time and told him he could not restore his eyesight. Plaintiff afterwards went to several other specialists, all of whom admitted that his loss of sight is permanent and that he is totally and permanently disabled from performing any work of a reasonable character.
Plaintiff's eyesight is not entirely gone, but is so affected as to prevent him from distinguishing different kinds of food on the dinner table, or of gauging distances. He has received several falls, due to lack of vision, one in alighting from a trolley and one from stepping off a sidewalk. Plaintiff is clearly incapacitated from performing any kind of work and his condition will grow worse instead of better, as testified to by all the doctors. The above facts are so clearly proven that we do not think there is any ground for dispute over them.
On the other hand, it is proven beyond a doubt that plaintiff has the following systemic conditions: Pyorrhea, infected tonsils and syphilis, and that this systemic condition could and often does result in blindness or loss of vision. It is also proven by the medical testimony and textbooks that the glare from an acetylene torch or other such light and heat, if the eye is exposed to it for a sufficient length of time, will and has caused blindness or loss of vision. Plaintiff contends that he is suffering from glare blindness and defendants contend his loss of sight is due entirely to his systemic condition and that the exposure of his eye to the glare of the blowtorch was no part of the cause of his loss of sight. It is our opinion, based upon the fact that the blindness occurred suddenly and at a time when plaintiff's eye was exposed to the heat and glare of the blowtorch and upon the testimony of the doctor who testified for plaintiff and several doctors who testified for defendants, that the blindness now suffered by plaintiff was caused and resulted from a combination of the systemic condition and the glare and heat of the blowtorch, and that the loss of vision would not have occurred when it did if the systemic condition had not existed or if he had not exposed his eye to the excessive glare and heat of the acetylene torch.
We feel safe in stating, from the medical testimony in the record, that the loss of eyesight resulting from a systemic condition does not occur suddenly, but is progressive *Page 241 
and finally results in complete blindness, and when we consider the undisputed facts that three days before plaintiff lost his eyesight, he was able to and did kill six birds on the wing, without missing a shot, and worked on jobs requiring good eyesight up to the very moment his vision became so blurred he was forced to cease his work, to our minds, completely rules out the systemic condition as the sole and only cause of plaintiff's blindness. This is especially true when we consider that the right eye had been of no use to plaintiff for nine years preceding that time. We realize as a fact that a man may be totally blind in one eye for a long time before he becomes aware of it, but when he has only one eye, there is no chance of his not realizing any appreciable loss of sight in that eye. Certainly, from the testimony in this record, we can not find that plaintiff suffered loss of sight in his left eye in any degree prior to exposing it to the glare of the blowtorch on the day his eyesight failed him.
We are of the opinion we might find that without the exposure to the glare of the torch, plaintiff would ultimately have lost his sight, as a result of his systemic condition, however, no eye specialist would testify that every man with the systemic condition the plaintiff has will lose his eyesight. Whether or not plaintiff would at some future date have lost his eyesight is not the question to be determined here. It is whether or not the exposure of the eye to the heat and glare of the blowtorch was the cause or contributing cause to the loss of eyesight at that time. We are of the opinion that the medical testimony as a whole shows that it was a contributing and accelerating cause.
The record discloses that the loss of eyesight from glare exposure in most cases is not permanent. It also discloses that where one is suffering the systemic conditions plaintiff was, what might be temporary blindness can become permanent blindness, and the condition of his system would retard and prevent a return to normalcy of the eyesight. A systemic condition which had not at the time seriously affected the eyesight might be aggravated, aroused and set in motion never again to be retarded by some injury to the eye such as is produced by exposure to the glare of an acetylene torch, etc.
Since we have stated that, in our opinion, the medical testimony of defendants' experts, as well as plaintiff's medical expert, preponderates in favor of the glare being the contributing cause of the loss of vision suffered by plaintiff and, since we disagree with the finding of the lower Court in that respect, we deem it advisable to call attention to some of this testimony:
There were four eye specialists who testified in the case. Dr. J.A. Wilkinson was offered by plaintiff and Doctors Leon F. Gray, I. Henry Smith and Kenneth B. Jones by the defendants. Dr. Wilkinson examined plaintiff in August following the accident on March 11th, and is positive he found no evidence of syphilis having affected the eye in any way; that if syphilis had been the cause of the injury to the eye, there would have been patches of choroiditis exudates in the retina or atrophy of the optic nerve, and that he found none of these present. He further testified that if plaintiff's blindness came on suddenly, he was bound to say the blowtorch was the cause of it and is positive in his opinion that plaintiff's blindness was caused by the glare from the torch and was not caused by syphilis.
Dr. Gray, offered by defendants, testified in chief in part as follows:
"Now, there is no way in the world that I can rule out the fact that the injury in the left eye did not aggravate the condition that occurred. There is no way that I can rule it out. All I can say is that the loss of vision in the left eye is not due to the accident sustained, sir."
He made a report, after examining plaintiff on March 23rd, in which he said, —
"Loss of vision and the poor color perception in the left eye are due to some systemic condition which the man has and they are not due to the accident which he sustained on March 11, 1942."
On cross-examination, it developed that in making his examination and report, Dr. Gray did not have the history of plaintiff's eye having been exposed to the glare of the torch for approximately a thirty-minute period. The history he had was that plaintiff got something in his eye or burned his eye externally with a blowtorch. When informed that plaintiff's eye was exposed to the glare for thirty minutes, he testified that glare could have caused the exact condition he found in the eye when he examined him. The doctor first thought the scratch or small cut place in plaintiff's eye was causing the trouble and after that healed and the sight did not return, he *Page 242 
knew it was something else so he had a Wassermann test made and his report was in substance that the scratch or cut on the eye was not the cause of the blindness and when he found plaintiff had syphilis, he assumed it was the cause of the blindness. The doctor was given the true facts leading up to the time blindness appeared and was asked if he would not say the loss of vision was an instance of glare blindness produced by the blowtorch. He replied, —
"It could have been. It certainly could have been."
Dr. Gray further testified, if plaintiff did not have any of the other diseases, especially syphilis, he could say the glare caused it, but in the face of all the facts he could not make a positive statement and stated he could not say the blindness was not absolutely a result of the glare.
"If he was exposed to that thing thirty minutes — a flash will not do it — but if he was exposed thirty minutes, it certainly could have done it."
The doctor then qualified the thirty-minute period of time required by saying it depends upon intensity, but just a flash would not cause it.
In re-direct examination, Dr. Gray testified that either the glare or syphilis could have caused the blindness. The following questions and answers sum up the doctor's conclusions:
"Q. But you cannot say positively that either one did it? A. Not either one. The combination of the four."
He then explained what he meant by the four — teeth, tonsils, syphilis and the glare.
Dr. Smith testified in chief that from his examination on May 22, 1942, he was of the opinion plaintiff's loss of vision was the result of syphilis and was not glare blindness. In answer to a question by the court, he said he did not think the trash in plaintiff's eye aggravated the condition, but he didn't know about the glare from the blowtorch; that would add some fuel to the condition if he really had the burn from the torch. He did not think, however, plaintiff had such a burn. The doctor testified on cross-examination that if plaintiff had this systemic condition on March 11th when he got acid in his eye and was exposed to the glare and heat of the torch, it would have more effect upon him than if he had been a healthy man. Then the following testimony was elicited by counsel for plaintiff:
"Q. Do you say, Doctor, that Mr. Haden could not have suffered some loss of vision on March 11th from the acid and from the glare of the torch? A. I think it would have aggravated his condition.
"Q. And would that be an actual and reasonable inference, that it had aggravated his condition? A. I think so. You add some fuel to the flame there."
Dr. Smith was asked by counsel for defendants on re-direct-examination if the disturbance to the eye caused by the glare and acid would pass off and not be permanent, and he replied, —
"Not with the systemic condition."
Then the following testimony was elicited:
"Q. All right. Now, assuming that Mr. Haden did get something in his eye on that date and was exposed to light and heat from a torch on that date, would those facts have had any permanent effect on that gradual and progressive blurring of vision? A. I think so.
"Q. In what way? A. Well, if you had a very sensitive retina, of course, you really received a flash there that was irritating to it; was adding some fuel to it.
"Q. Doctor, in your opinion of May 22nd, you said there was a slight cloudiness of the cornea but this alone would not account for fundus change in the left eye. You are speaking of the small amount of trash that fell in the face and the light from the torch. Did you find any condition on May 22nd that would lead you to believe that the dirt and trash and the light from the torch had brought about the impairment in vision? A. Well, he had a little cloudiness there on the cornea. I do not know what caused that.
"Q. All right. Now, assuming that that cloudiness on the cornea had been caused by the trash falling in his eye, do you consider that there was sufficient reaction on that date to lead you to the belief that the trash and the light from the torch had produced the condition that you found on May 22d 1942? A. No, it could not have produced it.
"Q. That is right. That is what I am getting at. What did produce it? A. Systemic disturbances."
Later in Dr. Smith's testimony he said there could have been a flash which would have aggravated the condition of the eye, but he could not see how a flash is going to explain the condition that exists in the *Page 243 
eye. Taking all the doctor's testimony it is clear, to our minds, that he is of the opinion the loss of vision suffered by plaintiff is due to his systemic condition, but that it was aggravated and accelerated by the foreign substances which fell in plaintiff's eye and the glare of the torch.
Dr. Jones, whose testimony was taken by deposition, is of the opinion that the sole cause of the plaintiff's loss of eyesight is syphilis. He did not consider the glare of the torch as a cause when he examined plaintiff and had no history to that effect. The only history of the case he could remember was that plaintiff got something in his left eye while working under a car.
We are convinced plaintiff has made out his case by a preponderance of the testimony and the judgment of the lower court rejecting his demands is erroneous and is reversed, and there is now judgment for the plaintiff, Joe Dan Haden, against A.G. Lee and the Maryland Casualty Company, in solido, in the sum of $20 per week for a period not to exceed 400 weeks, beginning March 18, 1942, with legal interest on each past-due payment until paid.
The fee of the attorney for plaintiff, Clifton H. Davis, is fixed at 20 per cent. of the amount collected under this judgment, not to exceed $1,000. All costs of both courts to be paid by the defendants.